FILED
11/18/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2024 Session

**STATE OF TENNESSEE v. COLBY MASON KILBURN**

**Appeal from the Circuit Court for Lawrence County**
**No. 50CC1-2020-CR-36288        M. Caleb Bayless, Judge**

————————————————————

**No. M2023-01021-CCA-R3-CD**

————————————————————

The Defendant, Colby Mason Kilburn, was convicted in the Lawrence County Circuit Court of first degree premeditated murder and received a sentence of life in confinement. On appeal, the Defendant contends that the evidence is insufficient to support his conviction because the State failed to prove premeditation and intent. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

G. Kline Preston, IV (on appeal), Nashville, Tennessee, and John S. Colley, III (at trial), Columbia, Tennessee, for the appellant, Cody Mason Kilburn.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Christi Thompson and Jessie Chandler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In June 2020, the Lawrence County Grand Jury indicted the Defendant for the first degree premeditated murder of Aaron Nicholas Stem. The Defendant went to trial in April 2023.

At trial, Tim McMillan testified that in March 2020, he was employed as a corporal corrections officer for the Lawrence County Sheriff's Department ("LCSD") and worked the 6:00 p.m. to 6:00 a.m. shift at the Lawrence County Jail. On the night of March 21,

another officer notified Mr. McMillan that a man in the lobby of the sheriff's department "looked like he was in a daze." Mr. McMillan went to the lobby and asked the man if he was okay. The man held out both hands and said, "[G]o ahead and restrain me." Mr. McMillian asked the man what he was talking about, and the man responded, "I did a murder." Mr. McMillan did not see any weapons on the man, did not ask him any further questions, and waited with him until a deputy arrived.

Mr. McMillan testified that when he first saw the man, the man was "sitting in the chair just staring out the window." The man "looked like he was dazed" and continued to stare straight ahead while Mr. McMillan talked with him. The State asked if the man was "[r]elatively calm," and Mr. McMillan said yes. Mr. McMillan said he could not identify the man in the courtroom.

On cross-examination, Mr. McMillen testified that he did not ask the man for a name or identification. Mr. McMillen did not handcuff him and did not see any blood or injuries on him.

Justin Kelsey testified that on the night of March 21, 2020, he was a patrol deputy with the LCSD and responded to a request for a deputy at the sheriff's department. When he arrived, the Defendant was sitting in a chair with two corrections officers. As Mr. Kelsey approached the Defendant, the Defendant stood up with his head down. He held out his hands "[l]ike he was waiting for handcuffs" and said he "needed to be arrested." Mr. Kelsey asked the Defendant what he was talking about, and the Defendant responded, "I shot somebody." Mr. Kelsey asked, "What do you mean?" The Defendant said that he "murdered somebody" and that he "shot them in the head." For Mr. Kelsey's safety, he asked the Defendant where the gun was located. The Defendant said "it was disassembled out back, so he didn't have it on him at the time." Mr. Kelsey patted down the Defendant for weapons, handcuffed and arrested him, and waited for a city officer to arrive. The Defendant told Mr. Kelsey that his name was "Zach Kilburn." Mr. Kelsey identified the Defendant in the courtroom as the man he arrested.

On cross-examination, Mr. Kelsey acknowledged that he was in uniform when he went to the sheriff's department and that the Defendant appeared to be "in a daze." Mr. Kelsey did not see any blood or injuries on the Defendant, and the Defendant did not want to make eye contact with him. The Defendant kept his head down and talked in a "low" voice.

Levi Freeman testified that in March 2020, he and the victim were employed at the Speedway convenience store in Lawrenceburg. Prior to their working together at the Speedway, Mr. Freeman had known the victim for four to five years because the victim was a customer of the store.

Mr. Freeman testified that on the night of March 21, he and the victim worked together at the Speedway. The victim "had a friend stop by, which he often did." That friend was the Defendant. Mr. Freeman did not know the Defendant personally but had seen him in the store about a week before this incident.

Mr. Freeman testified that the victim got off work early and that Mr. Freeman talked with the victim and the Defendant while the victim was "cashing out his register." No customers were in the store, so Mr. Freeman went outside to smoke a cigarette. The victim and the Defendant were still at the store, and the situation seemed calm. Mr. Freeman jokingly asked the victim if he was ever going to leave, and the victim was "joking back" with Mr. Freeman. However, the Defendant "never really said anything." The victim and the Defendant left in separate vehicles about 10:00 p.m. with the Defendant driving behind the victim. The State asked if Mr. Freeman noticed anything unusual about the Defendant's demeanor, and Mr. Freeman responded:

> As a matter of fact, yes. When -- after [the victim] pulled out, because like I said, the [Defendant] drove behind [the victim], you know, in their own vehicles, after [the victim] passed the building, [the Defendant] happened to look over at me and, like, his facial expression, like, changed. I don't really know how to describe it exactly, but, like, it just kind of gave me the creeps.

On cross-examination, Mr. Freeman testified that he did not remember "the specifics" of his conversation with the victim and the Defendant and that he did not remember hearing the two of them talk about "hanging out" together after work. Mr. Freeman acknowledged telling the police that the Defendant had a "'cold, disconnected'" expression on his face while Mr. Freeman and the victim were joking with each other. He also acknowledged telling the police, "'While I was outside smoking, the [Defendant] kept looking over at myself and [the victim] with the same disconnected look on his face.'" The Defendant was at the store no more than thirty minutes, and Mr. Freeman did not hear any "ill" words between the Defendant and the victim.

Dakota Blake Watts testified that he used to work with the victim at the Speedway convenience store in Lawrenceburg and that they became friends. At the time of the victim's death, Mr. Watts had known the victim for two to three years, but Mr. Watts was no longer employed at the Speedway.

Mr. Watts testified that the victim usually came to Mr. Watts' residence after the victim got off work. On the night of March 21, 2020, the victim and Mr. Watts were planning to go to Mr. Watts' mother's house. The victim left the Speedway and drove to Mr. Watts' apartment. Mr. Watts did not remember what time the victim arrived, but it

was dark outside. Mr. Watts was expecting the victim, so he went outside and got into the victim's truck.

Mr. Watts testified that the victim began driving and that the victim said someone had been following him since he left the Speedway. Mr. Watts told the victim to pull into the parking lot of a volunteer fire department so they could see who was following the victim. The victim turned into the lot, which was less than a mile from Mr. Watts' apartment, and they saw that it was the Defendant. The Defendant stopped his truck beside the driver's side of the victim's truck, and they rolled down their windows. Mr. Watts knew the Defendant because they had attended elementary school and high school together.

Mr. Watts testified that the Defendant said he wanted them to come by his apartment so he could show them something. The Defendant lived in the B&K Apartments, and the victim and Mr. Watts had been to the Defendant's apartment previously. The victim began driving to the Defendant's apartment complex, and the Defendant followed him. When they arrived, the victim and the Defendant parked their trucks, and the three men walked to the Defendant's apartment. Mr. Watts noticed a gun at the Defendant's side, and the Defendant said, "I only carry this sometimes." The Defendant walked into his apartment and put the gun on a table. The three of them then walked out the back door of the apartment to smoke on the patio.

Mr. Watts testified that the Defendant offered them a marijuana "joint" and that they smoked the joint and cigarettes. Mr. Watts said that he could not remember how long they were outside smoking but that he thought they were outside thirty minutes to one hour. He stated that the three of them were standing in a circle, were facing each other, and were about one foot apart so that they could pass the joint around. They were "[j]ust chitchatting random talking about stuff we did, laughing, cutting up," and no one was angry or arguing. When they finished smoking the joint, Mr. Watts asked the Defendant for a cigarette. The Defendant handed the cigarette to Mr. Watts, so Mr. Watts asked the Defendant for the Defendant's cigarette lighter. The Defendant handed the lighter to Mr. Watts, and Mr. Watts bent his head down and shielded the lighter from the wind. Mr. Watts stated:

> And as I leaned my head down to light the cigarette, I seen an arm swing, a flashing light, and a loud bang and my ears started ringing. And then I reached down and tried to grab [the victim] up because he fell, or I thought he fell, but he wasn't there.

Mr. Watts testified that he thought he saw "some liquid" on the victim's face and that the Defendant told him, "[R]un." The Defendant again told Mr. Watts to "run." Mr. Watts saw that the Defendant was holding a black and silver gun in his right hand and that the Defendant was pointing the gun at the victim. Mr. Watts ran because he was scared

and heard what sounded like another gunshot. He ran faster, lay down in a field, and "got sick." He got up and ran all the way home. He told his roommates what had happened, and they telephoned the police.

Mr. Watts testified that when the three of them first entered the Defendant's apartment, he saw the Defendant put the gun on the table. He did not see the Defendant pick up the gun, and he did not remember if the gun used to shoot the victim looked like the gun on the table. He also did not remember hearing anyone say anything before the shooting.

On cross-examination, Mr. Watts acknowledged that he testified at a previous hearing just thirteen days after the shooting and that his memory about the shooting would have been more accurate at the hearing than at trial. Mr. Watts testified at trial that he thought the victim arrived at his residence unannounced. At the previous hearing, though, Mr. Watts testified that the victim texted him at 8:00 p.m. about coming over. Mr. Watts also testified at the previous hearing that they had been at the Defendant's apartment only five to ten minutes when the shooting occurred, not thirty minutes to one hour. Although Mr. Watts testified on direct examination that he was about to light a cigarette when the Defendant shot the victim, he previously testified that "'I got it lit and about half way smoked'" when the Defendant shot the victim. Mr. Watts also previously testified, "'[The victim] walked to this side. I turned back to hit my cigarette. A loud flash in my eye or a loud bang in my ear and a bright flashing light. Before all of that, I seen the arm swing.'"

Mr. Watts testified that he was not looking at the Defendant or the victim at the time of the shooting but that he could see their feet. At the previous hearing, defense counsel asked if Mr. Watts saw the gun that was used to shoot the victim, and Mr. Watts answered, "'No, sir. I wasn't paying any attention to it. I was more worried about helping him out.'" Mr. Watts told the jury that he "didn't go into detail" at the previous hearing and that he was just explaining at the hearing what happened when he tried to pick up the victim. Mr. Watts said he saw the Defendant holding the gun after the Defendant told him to "run" for the second time. The Defendant was pointing the gun at the victim, who was lying on the ground, and at Mr. Watts, who had reached down to grab the victim.

On redirect examination, Mr. Watts testified that "[t]here was no aggression, conflict, just chill" prior to the shooting and that he did not see the victim try to take the gun from the Defendant. On recross-examination, defense counsel questioned Mr. Watts about the discrepancies in his trial testimony and his testimony at the previous hearing and suggested that he could not remember the shooting accurately. Mr. Watts stated, "It was, like we said, it was three years ago. . . . I just don't remember everything I said from that day. I can't give you everything exactly but I can give you the main detail." Mr. Watts acknowledged that he was not paying attention to what the victim and the Defendant were

doing at the time of the shooting but said that he would have seen their feet and legs move if the victim had tried to take the gun from the Defendant.

Detective Raymond Chavez of the LCSD testified that on the night of March 21, 2020, another officer notified him about a shooting at the B&K Apartments in which one male was deceased and the shooter was not in custody. En route to the apartment complex, Detective Chavez heard over the police radio that an officer was needed at the LCSD "for a possible suspect" in the case. Detective Chavez continued to the B&K Apartments, walked to a patio behind an apartment building, and saw the victim lying on his back. The victim had trauma to his head, and Detective Chavez could see a hole in his cheek. Parts of a disassembled gun were on the concrete, and the victim was lying near the disassembled firearm. Detective Chavez found two spent cartridges cases.

At that point, the State read two stipulations of fact to the jury. The first stipulation provided that the disassembled forty-five caliber pistol found on the patio was the gun that was used to kill the victim. The second stipulation provided that the pistol, which was reassembled and test-fired by a special agent from the Tennessee Bureau of Investigation ("TBI"), was in normal operating condition with the safety features functioning and that the two forty-five-caliber cartridge cases found at the scene were fired from the pistol.

Detective Chavez testified that as part of his investigation, he went to the Speedway convenience store and obtained the victim's timecard. He also viewed the store's surveillance video. The timecard showed that the victim "clocked out" at 8:59 p.m. The video, which did not have audio, showed that the Defendant entered the store about fifteen minutes before the victim clocked out. The Defendant and the victim appeared to have a normal conversation, and Mr. Freeman walked over and joined them. The Defendant went outside, and the victim clocked out and went outside. The Defendant and the victim appeared to have another normal conversation. One or two minutes later, Mr. Freeman walked outside, smoked a cigarette, and went back inside the store. The victim and the Defendant drove out of the parking lot with the Defendant's black pickup behind the victim's blue pickup. Detective Chavez was unable to obtain a copy of the video.

Detective Chavez testified that he collected gunshot residue kits from the hands of the Defendant and Mr. Watts on March 20, 2021, and that he submitted the kits to the TBI Crime Laboratory. Detective Chavez also obtained 911 call records for the shooting. The records showed that at 9:27 p.m., a resident of the B&K Apartments called 911 and reported hearing two gunshots. At 9:46 p.m., Mr. Watts' roommate called 911 and reported that the Defendant had shot the victim at the B&K Apartments.

On cross-examination, Detective Chavez testified that the Speedway video showed a short "gap" of time between the victim's and the Defendant's trucks leaving the parking

lot.  Defense counsel asked if it was "completely illogical" for the victim not to know that the Defendant was following him after they left the store, and Detective Chavez said the video did not show the direction in which each truck went.  He acknowledged that it was dark behind the Defendant's apartment and that the frame of the Defendant's gun could have been "sticking out" of the Defendant's blue jeans prior to the shooting.

Special Agent Lindsey Anderson of the TBI Crime Laboratory testified as an expert in forensic science and microanalysis that she received the victim's and the Defendant's gunshot residue kits for analysis.  Agent Anderson found gunshot residue in the Defendant's kit, meaning he could have discharged a firearm, handled a firearm, or been near a firearm when it was discharged.  Agent Anderson did not find any gunshot residue in Mr. Watts' kit.

Special Agent Lisa Forester of the TBI Crime Laboratory testified as an expert in forensic biology and DNA testing that she received for analysis the Defendant's clothing, the pistol pieces found on the patio, and DNA standards collected from the victim and the Defendant.  The Defendant's clothing and the pistol pieces were negative for blood.  Agent Forester found mixtures of "touch DNA" on the pistol's magazine, slide, barrel, spring, and buffer tube, but the DNA profiles were too limited for her to identify a contributor.  Agent Forester also found touch DNA on the gun's frame.  The DNA on the frame was a mixture of at least three individuals, but the "major profile" of the mixture consisted of the victim's and the Defendant's DNA.  Agent Forester said that she could not determine when or how the DNA was deposited onto the pistol frame and that she could not identify exactly where the victim and the Defendant touched the frame.

On cross-examination, Agent Forester acknowledged that one person could transfer a second person's DNA onto an object without the second person touching the object.  For example, a person could transfer DNA by shaking another person's hand and then touching an item.  Agent Forester acknowledged that the DNA on the pistol frame could have been transfer DNA rather than touch DNA.

The State recalled Detective Chavez to the stand.  Detective Chavez identified a recording of a jailhouse telephone call made by the Defendant to his mother the day after the shooting, and the State played the recording for the jury.  During the call, the Defendant's mother asked him what happened, and the Defendant told her that he did not want to talk about it.  She then asked him, "Was this self-defense?  Did he try to hurt you?" The Defendant said no.

Dr. Thomas Deering, a forensic pathologist for Forensic Medical Management Services, testified as an expert in forensic pathology that he conducted the victim's autopsy.  The victim sustained two gunshot entrance wounds to his head.  The wounds were "side

by side" on his right cheek, below his eye. Dr. Deering classified one of the wounds as "close to intermediate" because soot and stipple from the barrel of the pistol were around the wound, meaning that the end of the pistol barrel was six inches or less from the victim's face when the gun was fired. Dr. Deering classified the second wound as "distant" because no soot or stippling was around the wound, meaning that the end of the pistol barrel was more than two feet from the victim's face when the gun was fired. Dr. Deering could not determine which wound occurred first.

Dr. Deering testified that both bullets traveled front to back but that they traveled in different directions. One bullet traveled "a little bit from the midline outward" and struck the base of the victim's skull. The bullet broke into pieces and caused brain hemorrhaging, and the bullet fragments ended up around the victim's right ear. The second bullet traveled right to left and somewhat downward and ended up in the left side of the victim's neck. Both bullets struck the victim's sinuses. At some point during the shooting, the victim took a couple of breaths and aspirated blood into his lungs. Dr. Deering said that either bullet could have knocked the victim to the ground and that either gunshot would have been fatal.

Dr. Deering testified that a time delay could have occurred between the two gunshots and that the victim could have been lying on the ground when he sustained one of the gunshots. Dr. Deering did not find any other injuries on the victim, but toxicology tests showed "a little bit" of marijuana in his system. Dr. Deering concluded that the victim's cause of death was multiple gunshot wounds to the head and that the victim's manner of death was homicide.

At the conclusion of Dr. Deering's testimony, the State rested its case, and the Defendant did not present any proof. During the Defendant's closing argument, defense counsel acknowledged that the Defendant shot the victim but asserted that the State failed to prove premeditation beyond a reasonable doubt. The jury convicted the Defendant of first degree murder as charged in the indictment, and the trial court immediately sentenced him to life.

## ANALYSIS

The Defendant claims that the evidence is insufficient to support his conviction because the State failed to establish that he acted with premeditation and intent. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also*

Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. at § 39-11-302(a). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. at § 39-13-202(d) (2018). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).

In *State v. Thacker*, our supreme court provided a non-exclusive list of circumstances from which a jury may infer premeditation: the defendant's use of a weapon on an unarmed victim, the particular cruelty of the killing, the defendant's threats or

- 9 -

declarations of an intent to kill, evidence of the procurement of a weapon, the defendant's preparation before the killing to conceal the crime, the defendant's destruction or secretion of evidence after the killing, the defendant's calmness immediately after the killing, and the establishment of a motive for the killing. 164 S.W.3d 208, 222 (Tenn. 2005). Additional circumstances include a lack of provocation by the victim, the infliction of multiple wounds on the victim, and the failure to render aid to the victim. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009).

Taken in the light most favorable to the State, the evidence established that the Defendant went to the victim's workplace on the night of March 21, 2020. The Defendant stayed at the Speedway about fifteen minutes, had normal conversations with the victim, and left at the same time as the victim. The Defendant followed the victim to Mr. Watt's apartment and to the parking lot of the volunteer fire department. At that point, the Defendant asked the victim and Mr. Watts to come to his apartment so he could show them something. When the three of them arrived at the apartment, the Defendant put a gun he had been carrying onto a table, and they went outside to smoke on the Defendant's patio. They smoked marijuana and cigarettes, and no cross words were exchanged between the Defendant and the victim. Nevertheless, the Defendant suddenly pulled a gun, shot the victim in the face, and told Mr. Watts to run. When Mr. Watts bent down to help the victim, the Defendant again told Mr. Watts to run. Mr. Watts fled the scene and heard the Defendant fire a second shot into the victim's face.

The Defendant claims that none of the premeditation circumstances set forth in *Thacker* exist in this case and that the evidence fails to prove he acted intentionally because Mr. Watts' testimony that the Defendant shot the victim as Mr. Watts was lighting a cigarette was not credible. We strongly disagree with the Defendant. From the evidence, a rational jury could have found that the Defendant procured a gun, used the gun on the unarmed victim, shot the victim without any provocation, inflicted multiple wounds on the victim, tried to destroy or secret evidence by disassembling the gun after the killing, failed to render aid to the victim, and calmly turned himself in to law enforcement after the shooting. The Defendant shot the victim again after the victim already had fallen to the ground from the first fatal gunshot. The Defendant fired the second shot into the victim's face beside the first shot, and he fired one of the shots at close range. The Defendant's calmly telling Mr. Watts to run and waiting for Mr. Watts to flee prior to inflicting the second gunshot wound is additional evidence of the Defendant's premeditation and intent in this case. Mr. Watts consistently testified at trial and at the previous hearing that he did not see the Defendant shoot the victim in the face but that he saw the Defendant's arm swing and heard the gunshot. In any event, the jury obviously resolved any inconsistencies in Mr. Watts' testimony in favor of the State. The evidence is more than sufficient to support the conviction.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' brief, we affirm the judgment of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE